In 1986, the state of Ohio, Office of Collective Bargaining ("OCB") and Ohio Health Care Employees Union District 1199 ("union") entered into a three-year labor contract which provided for an employee health care plan. Article 15 provided in part:
"ARTICLE 15 — GROUP HEALTH INSURANCE
"The employer shall provide health insurance to the employees of the bargaining units * * *. The employer's maximum contribution for all health plans offered by this section is set at the following rates:
"A. For fiscal year 1988, single coverage under age 70, $80.70; single coverage over age 70, $33.90; family coverage under age 70, $193.52; and family coverage over age 70, $107.41;
"B. For fiscal year 1989, single coverage under age 70, $85.58; single coverage over age 70, $35.95; family coverage under age 70, $205.22; and family coverage over age 70, $113.90."
The state offered two health care plans, a traditional plan and an optional plan. The traditional plan provided a broad range of coverage for a higher premium, while the optional plan offered more limited coverage with deductibles and co-payments. Both plans were administered by a Blue Cross company but the premium rates and amount of coverage were set by the state and the state was, for all purposes, a self-insurer. At the time of the contract negotiations in 1986, the health care fund appeared to be actuarially sound but problems surfaced in 1987, necessitating an increase in rates. The financial problems were caused, in large part, by the number of state employees with fewer health problems who chose to participate in an optional plan with lower premiums, as well as the effect of two "rate holidays" whereby neither the employer nor the employees paid a premium but, rather, the premium was paid by the fund itself.
In late 1986 or early 1987, Ed Seidler, then director of OCB, contacted all the unions[1] who were a party to the 1986 labor contract to inform them of the serious problems with the health care fund. A joint committee of all unions and OCB was formed to determine how to meet the funding crisis. The agreement which *Page 537 
resulted in 1987 was put in writing and an acceptance letter on behalf of each union was signed,[2] which stated:
"Mr. Ed Seidler, Director
"Office of Collective Bargaining
"375 S. High Street
"Columbus, Ohio 43215
"Dear Mr. Seidler:
"I have received the attached agreement on health insurance, and agree that the changes are necessary, given the financial shape of the plan.
"Sincerely,
"Tom Woodruff
"President
"District 1119 WV/KY/OH"
Among the items agreed upon by the unions and OCB in 1987 was to put an employee premium cost onto the optional plan in an attempt to stop flight from the traditional plan, impose a penalty on employees who failed to get preadmission certification for non-emergency hospital stays or, in case of urgent admissions, to require a physician to contact the plan first unless the emergency was life-threatening. There was also agreement to provide for a penalty to providers who failed to comply with the 1987 agreement.
The 1987 agreement also provided for the creation of a task force to determine what further means were necessary to control health care costs. To enable the task force to accomplish its goal, as well as to determine the financial soundness of the fund, the state entered into a contract with Touche-Ross to do a study of the state health care plan which was completed in March 1988. The report recommended several alternative options to deal with funding problems. OCB sent copies of the Touche-Ross report to all unions involved and, without further discussion, announced a sixteen percent rate increase in April 1988.
On April 27, 1988, the union filed a complaint of an unfair labor practice, pursuant to R.C. 4117.11(A)(1) and (A)(5), alleging OCB bargained in bad faith and made material misrepresentations during bargaining. SERB found probable cause that there was an unfair labor practice and set the matter for a hearing.[3] *Page 538 
The SERB hearing officer found there was no unfair labor practice. The hearing officer found no evidence of fraud or misrepresentation as to the financial soundness of the plan in 1986. The hearing officer also found that, because the labor contract fixed the amount of employer contributions but was silent as to the amount of employee contributions, there was no requirement to negotiate the premium increase and no unfair labor practice.
The union appealed to SERB, which found that the 1987 and 1988 increases in health care premium rates were subject to collective bargaining pursuant to R.C. 4117.08(A). SERB reasoned that the contract language was not clear as to the authority of OCB to impose a unilateral increase and that, even if the contract had so provided, OCB voluntarily reopened negotiations pertaining to health care when it came to an agreement with the union in 1987 and, having negotiated a change in premium increases for the year 1987 to 1988, OCB had an obligation to negotiate before imposing a similar increase for 1988 to 1989.
OCB appealed to the Franklin County Court of Common Pleas, which concluded that, based solely on the language in the 1986 contract, there was no cap on employee contributions to premium payments and OCB could pass along the entire increase to employees and, hence, there was no requirement for further negotiation. The union appealed to this court and, in State Emp.Relations Bd. v. State of Ohio, Office of Collective Bargaining
(June 11, 1992), Franklin App. No. 91AP-939, unreported, 1992 WL 132463, this court reversed and remanded the matter to the court of common pleas. The trial court again reversed the order of SERB and the union has again appealed, setting forth the following assignments of error:
"First Assignment of Error
"The Trial Court On Remand Erred In Failing To Decide The Case In Accordance With This Court's Prior Opinion In The Case.
"Second Assignment of Error
"The Trial Court Erred In Disregarding The Findings Of SERB.
"Third Assignment of Error
"The Trial Court Erred In Vacating And Reversing SERB's Decision In This Matter."
Appellant's assignments of error are related and will be addressed together. *Page 539 
R.C. 4117.13(D) provides:
"Any person aggrieved by any final order of the board granting or denying, in whole or in part, the relief sought may appeal to the court of common pleas of any county where the unfair labor practice in question was alleged to have been engaged in * * *.
"The court has exclusive jurisdiction * * * to make and enter a decree of enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the board. The findings of the board as to the facts, if supported by substantial evidence on the record as a whole, are conclusive."
In Lorain City Bd. of Edn. v. State Emp. Relations Bd.
(1988), 40 Ohio St.3d 257, 533 N.E.2d 264, the court held, at the syllabus:
"1. The standard of review of a decision of the State Employment Relations Board on an unfair labor practice charge is whether there is substantial evidence to support that decision.
"2. Courts must afford due deference to the State Employment Relations Board's interpretation of R.C. Chapter 4117."
More recently in Univ. Hosp., Univ. of Cincinnati College ofMedicine v. State Emp. Relations Bd. (1992), 63 Ohio St.3d 339,587 N.E.2d 835, the court held, at the syllabus:
"1. The conclusion by a court of common pleas that an order of the State Employment Relations Board is not supported by substantial evidence on the record is a legal determination fully reviewable by the court of appeals."
The court further stated, at 343-344, 587 N.E.2d at 838-839:
"In Lorain City Bd. of Edn. v. State Emp. Relations Bd.
(1988), 40 Ohio St.3d 257 [260, 533 N.E.2d 264, 266], this court described the extremely deferential standard of review applied to factual determinations of SERB pursuant to R.C. 4117.13(D). We observed therein that disputes as to conflicting evidence `* are properly determined by SERB, which was designated by the General Assembly to facilitate an amicable, comprehensive, effective labor-management relationship between public employees and employers. * * * As long as SERB's decision on such matters is supported by substantial evidence, it must be affirmed. Courts should not be required to intervene in every factual dispute between contesting parties.'
"* * * *Page 540 
"Accordingly, while resolution of conflicting evidence is the province of SERB, the determination of whether the order of the agency can withstand the standard of review prescribed by R.C.4117.13(D) is essentially a question of law for the court of common pleas. As such, a reviewing court which seeks to ascertain whether the common pleas court has applied the appropriate standard of review to SERB's factual findings is not compelled to adhere to the conclusion reached by the common pleas court. Rather, it is the prerogative and the responsibility of the court entertaining the appeal to investigate whether the lower court accorded due deference to the factfinder. This is not unlike the function performed by this court * * * and prescribed by R.C. 119.12 for courts of appeals. Where the common pleas court has not properly deferred to the factual determinations of the agency as required by R.C.4117.13(D), it is within the authority of the appellate court to reverse the lower court and reinstate the order of the agency." (Footnote omitted.)
In its decision, SERB concluded that, if OCB had done nothing in 1987 and merely passed on the rate increase, based on language in the contract, there was some merit to its argument that it had no obligation to negotiate. However, SERB found that OCB voluntarily reopened contract negotiations in 1987 and, having done so, had an obligation to do so in 1988. In its decision, SERB focused on what should have occurred in 1988 rather than what, in fact, did occur. It was this finding that the trial court was to review on remand to determine whether there was substantial evidence to support SERB's finding.
In remanding this matter, this court, in its earlier decision, stated in part:
"[T]his court must remand this matter to the trial court so that it can determine whether there is substantial evidence to support SERB's decision that OCB had committed an unfair labor practice. * * * The trial court must determine whether the action of the OCB to unilaterally raise the employees health insurance premiums was violative of R.C. 4117.08(A). Likewise, the trial court must interpret the subsequent oral agreement between the parties and make a factual determination as to whether bargaining occurred prior to the time Touche-Ross became involved and whether OCB violated a statutory duty by not bargaining after the Touche-Ross firm released its report."[4] *Page 541 
Although characterized by OCB as merely meetings to disseminate information, there is sufficient evidence in the record to support SERB's finding that the 1987 agreement was a result of a negotiated agreement between the unions and OCB, and that OCB was required to bargain in 1988. Not only were rates raised in 1987, but other items not covered by Article 15 were included, such as a need for preadmission certification. This was more than an immediate response to a short-term funding problem, it was a modification of Article 15 of the contract. Formation of a task force and the contract for the Touche-Ross report were not done to just take an overall look at future health care planning but, rather, were to address continuing problems with the fund. All parties were aware that a one-time increase in 1987 would not make up the deficit in the health care fund and that increases would be needed in future years. In fact, the state contributed $7.5 million to the fund in 1988 and Paul Breese, assistant deputy director of OCB, stated that an additional amount had been contributed shortly before the hearing. All parties were aware that other cost containment measures would also be necessary.
The unilateral changes imposed by OCB in April 1988 did more than change the employee contribution rate. Joint Exhibit 3, the agenda for the April 1988 meeting when the sixteen percent premium increase was announced, shows the state, in addition to raising rates, agreed to contribute $7.5 million to the fund only if the unions accepted certain cost containment measures, such as use of expanded second opinion and generic drug lists, and adding employee penalties for failure to notify the plan in emergency cases. Thus, while the trial court looked at the agreement, to establish a task force and contract for a study by Touche-Ross, as merely an agreement to agree as to future health care planning needs, it was more than that. The issue presented to SERB was whether the issues relating to a premium increase and changes in coverage were issues which were required to be negotiated and whether or not such negotiations, in fact, took place. Regardless of the terms of the agreement surrounding formation of the task force and receipt of the Touche-Ross reports, the changes made in 1988 affected more than just an increase in rates and changed the terms and conditions of coverage and were items which were required to be collectively bargained pursuant to R.C. 4117.18. There was substantial evidence to support SERB's finding that OCB had committed an unfair labor practice.
In its decision, the trial court relied on Connecticut Light Power Co. (1984), 271 N.L.R.B. 766, 1984 WL 36668, for the proposition that there is no obligation to bargain over a midterm proposal. In Connecticut Light, the employer notified the union that it intended to give an increase in shift premium pay to non-union employees and would do the same for union employees if the union agreed. When the union requested a meeting with the employer to discuss the increase, *Page 542 
the employer refused and withdrew the offer. The National Labor Relations Board relied on Section 8(d) of the National Labor Relations Act, which provides:
"[T]he duties so imposed [to bargain in good faith] shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract."
In discussing the applicability of Section 8(d), the National Labor Relations Board stated:
"[I]t states that no party to a collective-bargaining agreement may be compelled either to discuss contract changes or to agree to them. The section does not qualify the right to refuse to discuss or agree to contract changes * * *."
The board did not find, as the trial court did, that a party had a right to unilaterally impose a contract change, particularly one adverse to one of the parties andConnecticut Light supports a conclusion opposite that reached by the trial court.
For the foregoing reasons, appellant's first, second and third assignments of error are sustained, and the judgment of the trial court is reversed. This matter is remanded to the trial court with instructions to enter judgment affirming the decision and order of the State Employment Relations Board.
Judgment reversedand cause remandedwith instructions.
WHITESIDE, P.J., and CLOSE, J., concur.
[1] The American Federation of State, County and Municipal Employees, Fraternal Order of Police, Communication Workers of America and the Ohio Education Association were also parties to the contract and participated in the 1987, 1988 meetings but are not parties to this appeal.
[2] Because of the approaching deadline for an open enrollment period, each union signed a separate acceptance letter rather than circulating one copy among all the unions.
[3] The complaint filed by the union states:
"The State of Ohio has refused to bargain over the matter of health insurance by making material misrepresentation during negotiations, by concealing information relevant to the bargaining process, and by bargaining in bad faith over the results of its misrepresentation and concealment."
[4] Granted, this court's instructions on remand could have been clearer, particularly with reference to interpretation of any subsequent oral agreement between the parties for further negotiations. Nonetheless, the import of this court's instruction on remand was for the trial court to determine whether the finding of SERB that OCB was required to enter into contract negotiations for the 1988-1989 health care premium rate increase was supported by substantial evidence. *Page 543